IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


**CHARNA MCCOY** *for*
**JULIETTE MCCOY**                         Case No. 1:16 CV 1301

      Plaintiff,

      v.                                   Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                           MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Charna McCoy filed a Complaint against the Commissioner of Social Security

("Commissioner") on behalf of her sister, Juliette McCoy ("Plaintiff"), seeking judicial review of

the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental

security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)

and 405(g). The parties consented to the undersigned's exercise of jurisdiction pursuant to 28

U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned

reverses the Commissioner's decision and remands for further proceedings consistent with this

opinion.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in March 2013, alleging a disability onset date of February

16, 2013.[1] (Tr. 215, 222). Her claims were denied initially and upon reconsideration. (Tr. 146, 155,

162, 164). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 176).

---

1. Plaintiff had previously applied for SSI and DIB alleging disability as of July 2, 2009. *See* Tr.
68. Plaintiff received an unfavorable decision in that case on February 15, 2013. (Tr. 68-84).

Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on March 11, 2015 (Tr. 38-64). On May 5, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 20-32). The Appeals Council denied Plaintiff's request for review. (Tr. 1-6). Plaintiff then filed the instant action on May 31, 2016. (Doc. 1).

**FACTUAL BACKGROUND**[2]

### Personal Background and Testimony

Plaintiff was born in May 1967 and was 45 years old at her alleged onset date. *See* Tr. 30. Plaintiff had a GED and had previously been a licensed as a state-tested nursing assistant (STNA). (Tr. 43-44). The license was no longer valid at the time of the hearing. (Tr. 44). Plaintiff stopped working in 2009 when her "job let [her] go." *Id.* She "had some problems in the past" and "just had a nurse that was bullying [her]", "[s]o [she] was told to clock out one night" and "that was the end of [her] job." *Id.* She had also worked some temporary nursing jobs. (Tr. 44-45).

At the time of the hearing, Plaintiff lived with her sister, and her "sister [took] care of [her]" (including cooking, cleaning, and laundry). (Tr. 45-46). Her medication made her tired, and she mostly just rested. (Tr. 45). Plaintiff dressed herself, but sometimes wore the same clothes for several days because she "[did not] feel like changing them or anything". (Tr. 46). Her sister encouraged her to go outside, and she did, "sometimes". (Tr. 48).

Plaintiff testified she left the house to go to doctor appointments, or to the store with her sister. (Tr. 46). She occasionally walked to the corner store by herself, but she was unable to drive;

---

2. The undersigned here summarizes only the medical evidence related to the errors Plaintiff raises. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived). Plaintiff challenges the only the ALJ's treatment of her mental impairments. As such, the undersigned summarizes only the related mental health medical records. Additionally, because the undersigned finds it unnecessary to reach Plaintiff's sentence six remand argument, those additional records will not be reviewed herein.

she did not have a driver's license. *Id.* Plaintiff sometimes took the bus by herself, but "[s]ometimes [she was] very uncomfortable, and [she had] to have somebody with [her]" because "[t]hat paranoia sets in". (Tr. 47-48). Plaintiff had come to the hearing by bus on her own. (Tr. 49).

Plaintiff testified that her sister has guardianship over her, and that her sister handles everything. (Tr. 50). When Plaintiff's sister was given guardianship, Plaintiff "was having problems handling different stuff" including being "not able to cook and stuff like that". (Tr. 51). Plaintiff's sister completed the majority of the guardianship forms. (Tr. 53).

Plaintiff testified that she had not had any hallucinations in the past week or two, but had episodes of paranoia. (Tr. 52). She explained: "that sets in so bad that sometimes I just feel like I can't go nowhere, or I need somebody to be with me when I go somewhere." *Id.* She stated she had anxiety on a daily basis. (Tr. 53). Plaintiff also testified to problems with her memory. (Tr. 55).

Plaintiff testified she was seeing a counselor and had a case manager at the Charak Center. (Tr. 54).

### *Relevant Medical Evidence*

In October 2011, Plaintiff underwent a crisis assessment with Mental Health Services for Homeless Persons, Inc. in Cleveland, Ohio. (Tr. 346-50). Plaintiff reported receiving mental health treatment since 2007, and believed she was disabled due to depression and mood swings. (Tr. 346). Plaintiff was upset with her living situation (she had been living with her sister who was receiving Section Eight housing assistance, but her sister had been evicted). *Id.* She also expressed frustration with a former case manager because he "refused to help her get SSI or give her a bus pass", but told her "to get out more [and] get a job." *Id.* The evaluating social worker noted Plaintiff's speech was pressured, but she was easily redirected, and her affect was appropriate, with good eye contact.

(Tr. 346-47). She denied suicidal or homicidal ideations. (Tr. 347). Plaintiff's mood was anxious and dysphoric, and the social worker noted Plaintiff reported being depressed and "[a]nxious about housing". *Id.* The duration of the current episode of mood disturbance was noted to be "[p]ast couple days ?". (Tr. 348). Her "reasoning [and] judgment [was] good". *Id.* Plaintiff was assessed with mood disorder, not otherwise specified, depressive disorder not otherwise specified, and histrionic personality disorder. (Tr. 349). She was assigned a Global Assessment of Functioning ("GAF") score of 50.[3] *Id.*

In February 2012, Plaintiff reported difficulty "meet[ing] home, work, or social obligations" and depressive symptoms. (Tr. 355). The provider observed Plaintiff was agitated, with pressured speech, constricted affect, and anxious and depressed mood. (Tr. 356). Her memory was "erratic/inconsistent", and her reasoning, impulse control, judgment, and insight were "poor". *Id.* Her "thought content reveal[ed] paranoia" and she expressed "fleeting" suicidal ideation. *Id.* Plaintiff had been off her psychiatric medications "for about a month." *Id.* Plaintiff was assessed with recurrent major depression, and unspecified psychosis, and assigned a GAF score of 49.[4] *Id.* She was advised "to get rated for psychiatry services at Metro". *Id.*

---

3. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32-33 (4th ed., Text Rev. 2000). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice"). However, as set forth in the DSM-IV, a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

4. As stated above, a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

The following day, Plaintiff was seen by Nikia Caston, D.O., at Broadway Express Care. (Tr. 551-54). Plaintiff reported ringing in her ear, feeling off balance, and vomiting. (Tr. 551). Plaintiff again reported suicidal ideation, hearing voices, and racing thoughts. *Id.* Dr. Caston assessed paranoid schizophrenia, depressive disorder, psychosis, and "[a]nxiety state, unspecified." (Tr. 552). Due to her psychological symptoms, "it was determined that she needed evaluation by Psychiatry" and she was "sent to St. Vincent Charity Hospital for evaluation." *Id.*

At the St. Vincent Charity Medical Center Psychiatric Emergency Department, the reasons for referral were noted as: major depression, anxiety, racing thoughts, auditory hallucinations to hurt herself, and suicidal ideations with a plan to jump in front of a train. (Tr. 378). Plaintiff was assessed with major depressive disorder, assigned a GAF score of 35[5], and discharged to Bridgeway Crisis Shelter. (Tr. 400). Plaintiff received inpatient treatment at Bridgeway from February 11 through March 8, 2012. (Tr. 362).

In March 2012, Plaintiff reported she was back on her medications, was "feeling better and voices ha[d] subsided" though the evaluator noted "she clearly remain[ed] guarded." (Tr. 368). Plaintiff additionally continued to report a depressed mood, with symptoms such as wanting to stay in bed, poor hygiene, feeling sad, and suicidal thoughts. (Tr. 366). She also reported sleep disturbances. *Id.* Plaintiff was diagnosed with recurrent depression with psychosis. (Tr. 369).

In July 2012, Plaintiff underwent a mental health assessment with Jyoti Aneja, M.D., due to depression. (Tr. 536-40). Plaintiff reported an increase in her symptoms over the prior six months and Dr. Aneja noted recent stressors of occupational issues, financial issues, living

---

5. As set forth in the DSM–IV, a GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication," or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (*e.g.,* . . . avoids friends, neglects family, and is unable to work)." DSM–IV at 34.

situation, conflicts with ex-husband, and mental illness of her sons. (Tr. 537). On examination, Dr. Aneja noted Plaintiff was well groomed, her behavior was cooperative, she was oriented, her speech was clear, and her thought process was logical. (Tr. 539). She had no abnormal thought process, her judgment and insight were fair; her attention span and concentration was sustained; and her memory was good. *Id.* Plaintiff's mood was noted to be "dysphoric, anxious, overwhelmed, [and] feels 'sad'". *Id.* Dr. Aneja diagnosed "[m]ajor [d]epression mild to moderate in severity [with] psychotic features, in partial remission" and assigned a GAF score of 51-60, indicating moderate symptoms. (Tr. 540). Dr. Aneja continued Plaintiff on Cymbalta and Seroquel and added Vistaril for anxiety. *Id.* ("Given that she has responded to her current meds, writer will continue . . . .").

In August 2012, Plaintiff returned to Dr. Aneja for pharmacologic management. (Tr. 532-35). Plaintiff reported she "had been doing better", but had been off her Seroquel because "she could not call the company herself." (Tr. 532). Dr. Aneja observed "some cognitive limitations" but it was "too early in her treatment . . . to assess for her cognitive capabilities" and noted that "[o]verall" Plaintiff was "calm, coherent and stable." *Id.* Dr. Aneja noted Plaintiff's mood was dysphoric, and judgment and insight were "fair", but the mental status examination was otherwise unremarkable. *Id.*

In October 2012, Plaintiff reported she "had been doing better but recently had been having some sudden jerky movements" both while awake and asleep. (Tr. 419). She "[o]therwise deni[ed] any current thoughts of depression or anxiety." *Id.* Dr. Aneja observed Plaintiff's cognitive abilities "seem limited but this seems to be chronic." *Id.* Dr. Aneja suggested Plaintiff take Seroquel very other day to see if that improved her symptoms. *Id.*

In December 2012, Plaintiff "appeared to be very anxious due to her recent SSI hearing which she feels[] did not go very well." (Tr. 433). Plaintiff was upset because her attorney informed her that Dr. Aneja "refused to be 'involved' in her SSI case." *Id.* Dr. Aneja explained she had previously told Plaintiff "that she needs to have a follow up longer than 6 months" before Dr. Aneja would complete any disability paperwork. *Id.* Dr. Aneja noted Plaintiff's cognitive issues were "overt but no major changes in her presentation." *Id.* Plaintiff's behavior was anxious, and her mood was anxious, dysphoric, and angry. *Id.* Plaintiff also reported difficulty with attention, concentration, and memory. *Id.* Dr. Aneja diagnosed major depression and mild intellectual deficit. (Tr. 420).

At an emergency room visit in January 2013, for a bug bite, the final diagnoses included bipolar disorder, depression, and schizophrenia. (Tr. 409-10).

In February 2013, Plaintiff returned to Dr. Aneja. (Tr. 442). Plaintiff reported her sister "continue[d] to help her financially and emotionally." *Id.* Dr. Aneja observed Plaintiff "continue[d] to show intellectual challenges in different aspects of conversation". *Id.* Plaintiff reported her medications "were working for her", stating "[m]eds make me calm." *Id.* On examination, Dr. Aneja noted Plaintiff's behavior was "restless", her mood was anxious, her affect constricted, and her attention and concentration impaired. *Id.* Plaintiff's thought process was circumstantial ("but this seems to be her baseline"), and she had normal memory and thought content. *Id.* Dr. Aneja noted "[n]o acute mood, anxiety, sleep or appetite issues" and therefore "[n]o med changes warranted at this time." *Id.* She diagnosed schizoaffective disorder and recommended Plaintiff follow up in two months. (Tr. 442-43).

In March 2013, Plaintiff went to Broadway Express Care complaining of a reaction to her psychiatric medications. (Tr. 455). She reported hallucinations and a feeling "like something is

crawling on her skin especially her left leg." *Id.* She reported this had been ongoing for a year and was "getting worse." *Id.* On examination, Plaintiff was "[c]ooperative[,] friendly, alert and oriented." *Id.* She was diagnosed with a reaction to her medication, prescribed Trazodone, and told to follow up with her primary care physician to make changes to her medications if needed. (Tr. 455-56).

Plaintiff followed up with Dr. Aneja regarding these symptoms. (Tr. 461-62). Plaintiff was "[v]ague and circumstantial about her responses when asked questions about this sudden complaint especially when she now reports that it has been going on for 'one year'." *Id.* It was unclear to Dr. Aneja whether Plaintiff had taken the prescribed Trazodone, and she recommended Plaintiff take it "to help her sleep." *Id.* Dr. Aneja recommended Plaintiff try a lower dose of Seroquel and increase Vistaril. *Id.* On examination, Plaintiff's behavior was restless and anxious, and she reported difficulty with attention and concentration. *Id.* Dr. Aneja also observed Plaintiff reported her mood was "OK", her affect was full, and her thought content was normal. *Id.* Dr. Aneja continued to diagnose recurrent major depressive disorder, and her impression was that Plaintiff was "[s]tabalizing." (Tr. 462).

In April 2013, Plaintiff saw family practitioner Jessica Griggs, D.O., for a gynecological examination, and to request paperwork be completed for her sister to be her legal guardian. (Tr. 467). Dr. Griggs declined to complete the paperwork, noting: "Social worker and psychiatry notes reviewed. Patient determined by psychiatrist to be mentally stable and in no need of guardian." (Tr. 468).[6]

---

6. Later that month, Plaintiff's sister called to speak with Dr. Griggs about Plaintiff's living situation. (Tr. 627). Dr. Griggs noted, that "[d]ue to HIPPA" she could not discuss Plaintiff's care with her sister without prior permission from Plaintiff. *Id.*

In May 2013, Plaintiff requested "Expert Evaluation for guardianship forms be completed". (Tr. 626). A social worker noted that Plaintiff's psychiatrist was "not willing to fill out form because she does not agree with guardianship." *Id.* At a visit later that month, Plaintiff again asked Dr. Aneja to complete the forms, stating "I want to live with my sister and get her help with many decisions." (Tr. 566). Dr. Aneja noted Plaintiff did not appear to have a complete understanding of legal guardianship. *Id.* Over the course of the session, Dr. Aneja discovered that Plaintiff's sister was moving, and she could only live with her sister if she was under guardianship. *Id.* Plaintiff was concerned about becoming homeless as she did not have the financial means to live independently. *Id.* Dr. Aneja explained that she could "write a letter to support [Plaintiff's] housing concerns but also explained how this legal guardianship is not the right way to address her current housing situation." *Id.* On examination, Plaintiff was anxious, her thought process tangential, and she reported difficulty with attention, concentration, and memory. *Id.* Dr. Aneja's impression was "[s]ymptoms unchanged" and she continued Plaintiff's medications and instructed her to follow up in five weeks. (Tr. 567).

In June 2013, Plaintiff reported to Dr. Aneja that the letter written in support of her living with her sister "did not work". (Tr. 561). Dr. Aneja noted Plaintiff had cognitive limitations, "which at times observed to have thought blocking but this appears to be her baseline presentation with no major clinical decompensation noticed today since I started seeing her in July 2012." *Id.* Plaintiff's behavior was cooperative and anxious, and her mood was anxious and dysphoric. *Id.* Her attention and concentration were impaired, but her memory was within normal limits. *Id.* Dr. Aneja noted Plaintiff's judgment and insight were "[q]uestionable", and that she had some paranoid thoughts. *Id.* She continued prior diagnoses and medications. (Tr. 562).

In August 2013, in connection with Plaintiff's application for guardianship, psychiatrist Rakesh Ranjan, M.D., from the Charak Center for Health & Wellness completed a "Statement of Expert Evaluation." (Tr. 325-32). Dr. Ranjan reported he had seen Plaintiff since June 2013 (and listed four visits). (Tr. 325). Dr. Ranjan listed Plaintiff's medications, and stated she was mentally impaired due to schizophrenia. (Tr. 326). He did not indicate the severity of the impairment, though the form asked for the "[t]ype and [s]everity" of the mental illness identified. *Id.* He opined she had an impairment in thought process, affect, concentration and comprehension, and judgment, but no impairment in orientation, speech, motor behavior, or memory. (Tr. 326). He reported she had a history of tactile, auditory and visual hallucinations; was easily distracted; had paranoid delusions; and had poor judgment and comprehension. *Id.* In response to a question about whether Plaintiff was capable of activities of daily living and making decisions, Dr. Ranjan answered "no" and explained that Plaintiff "needs some prompting to complete [activities of daily living]; [and is] unable to cook for self or maintain own finances". (Tr. 327). Dr. Ranjan also answered "no" to whether Plaintiff was capable of maintaining her own finances, explaining that Plaintiff's "sister currently assists with managing finances." *Id.* He recommended a guardianship be established. *Id.*

In September 2013, the probate court declared Plaintiff incompetent and Plaintiff's sister was appointed guardian. (Tr. 329).

In October 2013, Plaintiff saw Dr. Aneja for the last time. (Tr. 586-88). Dr. Aneja noted "[n]o observable decompensation in clinical presentation." (Tr. 587). Plaintiff reported she had been seeing another psychiatrist" and "that she just came today to let [Dr. Aneja] know about her transfer of care." *Id.* Plaintiff was still upset about Dr. Aneja's refusal to support her guardianship application. *Id.* Dr. Aneja told Plaintiff she was free to follow up if she changed her mind. *Id.* On

examination Plaintiff was anxious, angry, irritable, distractible, with tangential thought process and paranoid thought content. *Id.* Dr. Aneja's impression was "[s]ymptoms unchanged". (Tr. 588).

*Opinion Evidence*

In May 2013, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed Plaintiff's records. (Tr. 94). She concluded Plaintiff was mildly limited in her activities of daily living; and moderately limited in both maintaining social functioning and maintaining concentration, persistence, or pace. *Id.* She concluded there were "no new or material changes" since the prior ALJ's decision and adopted the mental residual functional capacity from that decision. (Tr. 96). That prior mental RFC limited Plaintiff to: (1) carrying out tasks that are simple and routine; (2) no high production quotas, strict time requirements or work paid at a piece rate; (3) no arbitration, negotiation, confrontation; (4) no directing the work of others or being responsible for the safety of others; and (5) no more than superficial interactions with co-workers or members of the public. (Tr. 75).

In November 2013, state agency reviewing psychologist Cindy Matyi, Ph.D., affirmed Dr. Haskins's conclusions. (Tr. 120). She explained:

> Although the claimant clearly does struggle with some mental health issues, the file reveals some discrepancies in her presentation and efforts to manipulate the system for secondary gain (for example, asked a treating source to fill out guardianship papers so she could be allowed to live with her sister). While the court recently appointed a guardian for the claimant, the evaluation supporting this decision is not available, and given the questionable veracity of some of the claimant's statements this fact in and of itself does not constitute new and material changes in her condition. Overall, the current available evidence seems consistent with the ALJ decision dated 02/15/2013 and the PRTF/MRFC is being adopted under AR 98-4 (Drummond Ruling).

*Id.*; *see also* Tr. 123 (same explanation).

In January 2014, social worker LaToya Hampton completed a medical source statement. (Tr. 591-92). The pre-printed form instructs: "If completed by LISW, counselor or psychiatric

nurse, please have Psychiatrist or Psychologist co-sign." (Tr. 592). There is a second signature on the form, but no printed name (or date) accompanying it. *See id.*[7] The assessment stated Plaintiff could occasionally: (1) follow work rules; (2) use judgment; (3) maintain regular attendance and be punctual; (4) deal with the public; (5) relate to coworkers; (6) understand, remember, and carry out simple job instructions; (7) maintain appearance; (8) socialize; (9) behave in an emotionally stable manner; and (10) leave home on her own. (Tr. 591-92). The assessment indicated Plaintiff could only rarely: (1) maintain attention and concentration for extended periods of two hour segments; (2) respond appropriately to changes in routine settings; (3) interact with supervisors; (4) function independently without redirection; (5) work in coordination with or proximity to others without being distracted or distracting; (6) deal with work stress; (7) complete a normal workday and workweek; (8) understand, remember, and carry out detailed or complex job instructions; (9) relate predictably in social situations; and (10) manage funds or schedules. *Id.* Ms. Hampton explained that Plaintiff had depression with "sadness, crying spells, change in appetite, low motivation, isolation, schizophrenia with tactile, visual, and auditory hallucinations, paranoia, mood swings, poor sleep, and anxiety. *Id.* The form indicated Plaintiff had been a patient since June 7, 2013. *Id.*

---

7. Plaintiff asserts this is Dr. Ranjan's signature, comparing it to records later submitted to the Appeals Council. *See* Doc. 17, at 8 n.1. ("It's important to note that at the time of hearing, counsel had no way to know who had signed the MRFC form as a physician because the underlying treatment records had not yet been received. A review of these records confirms that the signature is that of the treating psychiatrist Dr. Ranjan (Compare for example: Tr. 592, 672)."). The Commissioner notes that "[t]hough the form requested the co-signature of a psychiatrist or psychologist, no such signature was provided." (Doc. 21, at 8). This is incorrect. The form *does in fact* contain a second signature (but no printed name). *See* Tr. 592.

### VE Testimony & ALJ Decision

#### VE Testimony

A VE testified at the administrative hearing. (Tr. 55-60). The ALJ first asked the VE to assume a hypothetical individual with Plaintiff's age, education, and past relevant work experience with the mental residual functional capacity for employment:

> with a . . . limitation to tasks that are simple; and routine; and do not involve high production quotas; or strict time requirements; or work that is paid at a piece rate; with a further limitation of work which would not require engaging in arbitration; negotiation; confrontation; directing the work of others; or being responsible for the safety of others; with an additional limitation of work which would not have more than superficial interactions with coworkers; or members of the public.

(Tr. 57). The VE responded that such an individual could not perform Plaintiff's past work, but could perform work as a laundry worker, hand packager, or housekeeping cleaner. (Tr. 57-58).[8]

Plaintiff's counsel asked the VE to consider a hypothetical individual with Plaintiff's age, education, and past relevant work experience, but limited to: "no contact with the public; no contact with coworkers; no more than 10 percent contact with supervisors; [and] would have to be redirected a third of the day." (Tr. 59-60). The VE responded that such an individual could not maintain competitive employment. (Tr. 60).

#### ALJ Decision

In a decision dated May 5, 2015, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014, and had not engaged in substantial gainful activity since her February 16, 2013, alleged onset date. (Tr. 23). She found Plaintiff had severe impairments of "affective disorder, schizophrenic, paranoid, and other psychotic disorders, and anxiety-related disorders" (Tr. 23), but that these impairments

---

8. The ALJ asked a follow-up question, but only modified the physical restrictions in the hypothetical, not the mental restrictions. (Tr. 58-59).

individually or in combination did not meet or medically equal the severity of a listed impairment

(Tr. 25). The ALJ concluded Plaintiff maintained the mental residual functional capacity for:

> carrying out tasks that are simple and routine, but . . . not . . . involving high production quotas, strict time requirements or work that is paid at a piece rate[;] she [was not] able to perform jobs where she would have to engage in arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others[; and] she [was not] able to perform jobs where she would have more than superficial interaction with co-workers or members of the public.

(Tr. 26-27). The ALJ then found Plaintiff was unable to perform any past relevant work, but could

perform other work in the national economy. (Tr. 30-31). As such, the ALJ concluded Plaintiff

was not disabled from her alleged onset date—February 16, 2013—through the date of the ALJ's

decision. (Tr. 32).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &

Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

4. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff presents three arguments: (1) the ALJ erred in refusing to grant a subpoena request for medical records (and failed to develop the record); (2) new and material evidence requires remand; and (3) the ALJ's mental RFC is not supported by substantial evidence. The Commissioner responds that the ALJ did not err, and a sentence six remand is not required. For the reasons discussed below, the undersigned concludes a sentence four remand is required.

### *Subpoena Request*

Plaintiff first contends the ALJ erred in failing to properly respond to her request for a subpoena of records. (Doc. 17, at 11-13). Specifically, she contends the ALJ failed to comply with a provision of the Hearings, Appeals & Litigation Law Manual ("HALLEX") dictating how an ALJ should respond to a subpoena request. The Commissioner responds that any error by the ALJ in denying the request is not reversible error. (Doc. 21, at 12-13).

HALLEX I-2-5-78 contains certain procedural requirements, and requires an ALJ to decide whether a requested subpoena is "reasonably necessary for the full presentation of a case" and if it is not, the ALJ must "notify the claimant of the denial, either in writing or on the record at a hearing". Soc. Sec. Admin., *Use of Subpoenas – General*, Hearings Appeals & Litigation Law Manual, *available at* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-78.html (last visited July 19, 2017). The ALJ here did not do so, but rather, in her written decision, stated:

> On February 23, 2015, the claimant's representative requested the undersigned to issue a subpoena to Charak Center for Health and Wellness for records from January 1, 2011 to the present. (Exhibit B19E). The representative noted they had requested the records three times with the last request made on December 1, 2014. The undersigned denied this request for failure of the representative to fulfill the requirements of 20 CFR 405.332.

16

(Tr. 21).[9]

The Sixth Circuit has held the HALLEX provides "procedural guidance to the staff and adjudicators of the Office of Hearings and Appeals", but is "not binding on this Court." *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008).[10] Thus, to the extent the ALJ did not comply with HALLEX I-2-5-78 by failing to deny Plaintiff's subpoena request in writing or on the record, such an error is not reversible. *See Hull-Kitchen v Colvin*, 2013 WL 423278, at *12 (finding no reversible error due to ALJ's failure to respond to a subpoena request because: (1) the HALLEX is not binding, and (2) Plaintiff's request did not comply with the regulation's requirement that a subpoena request identify the important facts such records were expected to prove), *report and recommendation adopted by* 2013 WL 792920 (S.D. Ohio). Thus, any noncompliance with the HALLEX provision does not require reversal in and of itself.

### Duty to Develop the Record

Although a violation of the HALLEX provision may not provide a basis for reversal, within her HALLEX subpoena argument, Plaintiff contends the ALJ failed in her duty to fully and fairly develop the record. *See* Doc. 17, at 12. For the reasons discussed below, the undersigned agrees.

An ALJ has an affirmative duty to fully develop the factual record upon which her decision rests. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983). This duty applies regardless of whether a claimant is represented because of the non-adversarial nature of Social Security benefit proceedings. *See Heckler v. Campbell*, 461 U.S. 458, 470 (1983); *Ray*

---

9. The undersigned notes that the ALJ's language reads as if she had *previously* denied the subpoena request, but her written decision is the first mention of the denial in the record. *See* Tr. 62-63 (leaving open the subpoena question).
10. There appears to be a circuit split on this issue of whether the HALLEX creates enforceable rights. *See Davenport v. Astrue*, 417 F. App'x 544, 547 (7th Cir. 2011) (collecting cases).

*ex rel. A.K.D. v. Colvin*, 2014 WL 4365109, at *13 (N.D. Ohio) ("As a result, an ALJ has an affirmative duty to develop the factual record upon which his decision rests, regardless of whether the claimant is represented by legal counsel at the administrative hearing.") (citing *Lashley*, 708 F.2d at 1051). The Sixth Circuit has emphasized that this duty is particularly important when a claimant is acting *pro se*. *See Lashley*, 708 F.2d at 1051. The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability).

"ALJs are not required to 'exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment.'" *Spurlock v. Comm'r of Soc. Sec.*, 2013 WL 5316908, at *8 (N.D. Ohio) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997). The determination of whether the ALJ has satisfied the duty to develop the record is not a bright line rule, but one that must instead be made on a case-by-case basis. *Lashley*, 708 F.3d at 1052; *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 262 (6th Cir. 2015). District courts within this circuit have held that "[w]here there are obvious gaps in the record, the ALJ has the duty to develop the administrative record with respect to the missing evidence." *Kendall v. Astrue*, 2011 WL 4388794, at *5 (E.D. Ky.) (citing *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate facts and develop the arguments both for and against granting benefits.").

Here, Plaintiff was represented by counsel, and the ALJ was therefore not under a *heightened* duty to develop the record. Several other factors, however, militate in favor of a finding that the ALJ violated her basic duty to develop the record.

Prior to the hearing, Plaintiff's counsel brought to the ALJ's attention that she had been unable to obtain the records from the Charak Center despite numerous written and telephonic requests. (Tr. 336). This was again discussed at both the beginning and end of the hearing:

ALJ: Do you have any new exhibits that need to be offered into evidence, or do you consider the record complete?

ATTY: The record is not complete. We requested - - we requested a subpoena from, your honor, for Sherak Center for Health and Wellness [phoenetic]. We've sent them three requests. We've made phone calls. No response from them whatsoever. I didn't see the request for subpoena on exhibit disk? I have a tracking number for when we filed it. But I don't know if it made it to your file, or I don't know what's going on?

ALJ: Let me see? Okay. Oh, here it is, requested February 23?

ATTY: Yes, is it - - is it part of the exhibits that I - -

ALJ: No, I could add it in, though.

ATTY: - - okay.

ALJ: Okay. All right. I've added that one in.

ATTY: Thank you, judge.

(Tr. 42).

ALJ: . . . Then I have what I need then to make a decision. And I will issue a written decision to you, Ms. McCoy, with a copy to your attorney, Mr. Mohammed L. Shimharie. And I want to thank you, both, for coming in today. And we are going to close the record. Counsel, are we absolutely certain that we can't get these records from Sherack [sic]?

ATTY: We requested them three times in writing. We have left voice mails. They haven't even returned our voice mails.

ALJ: Well what kinds of records are they?

ATTY: Psych.

ALJ: But for counseling, or - -

ATTY: They would be any - - all the progress notes. She sees the - - she testified that she sees the therapist. She's two - - she sees two people there - - based on her testimony, at least two people there. So I'd go ahead - - I would leave it to you.

ALJ: -- mm-hmm.

ATTY: We have the probate court. And we have the assessment - - or the MRFC [phonetic] from Ms. Hampton. She may be over at Sherack.

ALJ: Okay.

ATTY: So I mean probate court felt she was incompetent. I don't know if you need more than that? If you do, certainly I would - -

ALJ: Okay.

ATTY: - - I would request that, your honor, subpoena those records? If you feel that's sufficient, you can make a decision based on that?

ALJ: All right. Well I'll make that determination after I review everything carefully. So with that exception, I have a - - what I need to make a decision.

(Tr. 62-63).

Plaintiff also testified at the March 2015 hearing, that she was seeing "a counselor" and had a "case manager" at the Charak Center. (Tr. 54). The ALJ was thus made aware that Plaintiff was receiving ongoing treatment. Without the Charak Center records, the ALJ had *no* treating

psychiatric medical evidence of record after Plaintiff's October 2013 visit with Dr. Aneja[11] (Tr. 586-88), and no evidence at all after the state agency's November 27, 2013, review of the records (Tr. 120). *See also* Tr. 30 (summarizing Dr. Aneja's October 2013 visit and then stating "[t]he claimant then stopped seeing Dr. Aneja and she started seeing a different treating source."). This leaves a gaping hole in the record of over eighteen months between the last psychiatric treating evidence and the ALJ's May 2015 written opinion. (Tr. 20-32). And, although a claimant bears "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination", *Landsaw*, 803 F.2d at 214, here, Plaintiff appears to have done everything in her power to obtain the Charak Center records before requesting assistance from the ALJ. *See* Tr. 336 (letter requesting subpoena and describing previous efforts to obtain records); *see also* Tr. 42, 62-63 (hearing discussion regarding subpoena and missing records). Additionally, this is not a case where there was a gap in treatment, or where the ALJ was unaware of additional records. Here, it was specifically brought to her attention that additional records existed. This is an "obvious gap[] in the record". *Kendall*, 2011 WL 4388794, at *5.

Moreover, the failure to obtain these records colors the ALJ's opinion. First, as Plaintiff points out, there is a second signature on Ms. Hampton's January 2014 medical source statement. *See* Tr. 592. Plaintiff's counsel noted at the hearing that Ms. Hampton "may be over at Sherack [sic]." (Tr. 62). Plaintiff asserts this is Dr. Ranjan's signature, comparing it to records later submitted to the Appeals Council. *See* Doc. 17, at 8 n.1. ("It's important to note that at the time of

---

11. Ms. Hampton's mental RFC analysis was provided in January 2014, but contained no accompanying treatment or counseling notes. *See* Tr. 591-92.

hearing, counsel had no way to know who had signed the MRFC form as a physician because the underlying treatment records had not yet been received. A review of these records confirms that the signature is that of the treating psychiatrist Dr. Ranjan (Compare for example: Tr. 592, 672).”). The Commissioner notes that “[t]hough the form requested the co-signature of a psychiatrist or psychologist, no such signature was provided.” (Doc. 21, at 8). This is incorrect. The form *does in fact* contain a second signature (but no printed name). *See* Tr. 592. And, the undersigned need not look to the later-submitted evidence (which is not part of this Court’s substantial evidence review). Rather, the undersigned notes in passing that in comparing the signature on the guardianship paperwork—purportedly that of Dr. Ranjan—it appears this signature may be the same as that on Ms. Hampton’s medical source statement. *Compare* Tr. 327 *with* Tr. 592.

With a full development of the record, the ALJ may have treated this medical source statement differently. *See, e.g.*, *Borden v. Comm’r of Soc. Sec.*, 2014 WL 7335176, at *9 n.2 (N.D. Ohio) (a “team” opinion signed by both a non-acceptable medical source and a physician qualifies as a treating physician’s opinion and is entitled to deference “when there is evidence demonstrating that the statement presented to the ALJ represented the opinions of a team effort, or that the medical facility used a team approach to a claimant’s . . . treatment.”). As it was, the ALJ found the opinion written by an “other source” and discounted the opinion, finding “the evidence would indicate collusion with the claimant to obtain guardianship papers after the refusal of Dr. Aneja to complete guardianship papers.” (Tr. 29). The ALJ reached this conclusion without having (or attempting to obtain) any treatment records from the time period surrounding this opinion, despite Ms. Hampton’s January 2014 opinion stating Plaintiff had been a “patient since June 7, 2013”. (Tr. 592). Under the circumstances, this was error.

At the end of the hearing, in discussing whether to subpoena the records, the ALJ stated she would "make that determination after [she] review[ed] everything carefully" (Tr. 63), implying that she would determine later if the requested records were necessary to her decision. It strains credulity to conclude that the *only* psychiatric evidence covering over a year-and-a-half was not reasonably necessary to the disability determination and that no further attempt to obtain it be made.[12]

Because the ALJ failed in her duty to fully and fairly develop the record regarding the relevant time period, the undersigned cannot determine whether her decision is supported by substantial evidence. As such, remand is required. *See, e.g., Moreiras-Maczko v. Astrue*, 2011 WL 5362062, at *8 (N.D. Ohio) (remanding when an ALJ failed to request a treating mental health provider's file). Because remand is required to fully develop the record under sentence four, the undersigned need not reach Plaintiff's sentence six remand argument, nor her mental RFC argument.

_____

12. Although Plaintiff did ultimately obtain at least some of these records and submit them to the Appeals Council, they are not part of this Court's "substantial evidence" review. *Foster*, 279 F.3d at 357 ("[E]vidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.").

Because the undersigned finds the ALJ's decision lacks the support of substantial evidence for failure to develop the record, the undersigned need not reach Plaintiff's sentence six argument that the later-submitted require a sentence six remand. The undersigned recognizes that the practical effect of this decision is that the ALJ will consider the later-obtained records, which would be the same result as if the undersigned concluded a sentence six remand was required. However, the undersigned makes no finding as to whether the evidence is new and material, because the undersigned has found error at an earlier stage. Additionally, the ALJ in fulfilling her duty to develop the record on remand, may obtain more records than Plaintiff did. Although Ms. Hampton's statement indicated Plaintiff had been a patient since June 2013, the records submitted to the Appeals Council only span the time period from January 2014 through April 2015. Because the ALJ erred in failing to fully and fairly develop the record, it is the ALJ's duty to evaluate this—and any other—evidence in the first instance. Any analysis by the undersigned of that evidence at this stage would constitute improper judicial fact finding.

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision not supported by substantial evidence, and remands the case under sentence four of 42 U.S.C. § 405(g) for the ALJ to fully develop the record.

 s/James R. Knepp II
United States Magistrate Judge